**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                            :
     DREIER LLP,                         :     Chapter 11
                                          :     Case No. 09-15051 (SMB)
                      Debtor.    :
---------------------------------------------------------------x
SHEILA M. GOWAN, Chapter 11 Trustee       :
of DREIER LLP,                                    :
                                          :
                      Plaintiff,   :
                                          :     Adv. Proc. No. 10-04277 (MG)
     v.                                   :
                                          :
XERION PARTNERS II MASTER FUND, *et al.*,    :
                                          :
                      Defendants.  :
---------------------------------------------------------------x

NOT FOR PUBLICATION

**MEMORANDUM OPINION GRANTING TRUSTEE'S MOTION TO APPROVE
SETTLEMENT PURSUANT TO FED. R. BANKR. P. 9019**

*A P P E A R A N C E S:*

DIAMOND McCARTHY LLP
*Attorneys for Sheila M. Gowan, Chapter 11 Trustee for Dreier LLP*
620 Eighth Avenue, 39th Floor
New York, NY 10018
By:   Howard D. Ressler, Esq.
       Stephen T. Loden, Esq.


WEIL, GOTSHAL & MANGES LLP
*Attorneys for Defendants Xerion Partner Partners II Master Fund II, Ltd.
and Perella Weinberg Partners Xerion Fund Master Fund, Ltd.*
767 Fifth Avenue
New York, NY 10153
By:   Jonathan D. Polkes, Esq.
       Richard W. Slack, Esq.
       Robert J. Lemons, Esq.
       Margarita Platkov, Esq.

1

KLESTADT & WINTERS, LLP
*Attorneys for Official Committee of Unsecured Creditors*
570 Seventh Avenue
17th Floor
New York, NY 10018
By:   Tracy L. Klestadt, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 and 11 U.S.C. § 363 For an Order Authorizing and Approving Settlement Agreement Between the Chapter 11 Trustee, Sheila M. Gowan, and Xerion Partners II Master Fund, Ltd./Perella Weinberg Partners Xerion Master Fund, Ltd.* (the "Motion").  (ECF Doc. # 35.)  Pursuant to the Motion, the Chapter 11 Trustee, Sheila M. Gowan, (the "Trustee") seeks an order from the Court approving the proposed settlement (the "Settlement Agreement") of adversary proceeding number 10-04277, entitled *Sheila M. Gowan, Chapter 11 trustee for Dreier LLP v. Xerion Partners II Master Fund, Ltd. and Perella Weinberg Partners Xerion Master Fund, Ltd.* (the "Adversary Proceeding").  The Trustee's action against Xerion Partners II Master Fund, Ltd. and Perella Weinberg Partners Xerion Master Fund, Ltd. (together, the "Fund") seeks avoidance and recovery of transfers from Dreier LLP to the Fund under the Bankruptcy Code and New York Debtor and Creditor Law[1] (the "NYDCL").

The Settlement Agreement resolves all disputes between the Trustee and the Fund, including the Adversary Proceeding and the proof of claim filed by the Fund in the bankruptcy case in the amount of $46,027,639 (plus attorney fees and costs).  No objections were filed to the Motion.

For the reasons explained below, the Motion is granted.

---

[1]   N.Y. DEBT. & CRED. LAW § 270 *et seq.* (McKinney 2011).

## I. BACKGROUND

### A. Background of the Adversary Proceeding

An extensive discussion of the adversary proceedings filed by the Trustee is contained in three opinions issued by the Court today resolving motions to dismiss filed by the defendants in those adversary proceedings. *See Gowan v. Amaranth LLC. (In re Dreier LLP)*, Adv. Pro. No. 10-03493 (MG), ECF Doc. # 53 (June 16, 2011) (the "*Amaranth* Opinion"); *Gowan v. Novator Credit Management (In re Dreier LLP)*, Adv. Pro. No. 10-04278 (MG), ECF Doc. # 37 (June 16, 2011) ( the "*Novator* Opinion"), and *Gowan v. The Patriot Group, LLC (In re Dreier LLP)*, Adv. Pro. No. 10-03524 (MG), ECF Doc. # 46 (June 16, 2011) (the "*Patriot Group* Opinion"). The Fund also moved to dismiss the complaint in this case. (*See* ECF Doc. # 9–11.) The arguments in support of the motions to dismiss in all four cases were substantially similar, and the Court heard argument of all of those motions on April 5, 2011. Familiarity with the *Amaranth*, *Novator* and *Patriot* Opinions is assumed. Only a discussion of the facts relevant to the *Xerion* case is included here.

Dreier LLP's (the "Debtor") chapter 11 case was precipitated by the arrest of Marc Dreier ("Dreier"), the Debtor's sole equity partner, on charges that he was running a massive Ponzi scheme. (Motion ¶ 10.) As part of the scheme, Dreier induced third party investors to purchase certain promissory notes that had supposedly been issued by clients of the Debtor (the "Note" or "Notes" or "Solow Notes"). (*Id.*) To purchase the bogus Notes, purchasers transferred funds to one of the Debtor's bank accounts with the last four digits "5966" (the "5966 Account"). (*Id.*) When payments of fees, interest or principal came due on the fraudulent Notes, Dreier would transfer funds to the purchasers from the 5966 Account so that the purchasers believed the Notes were genuine. (*Id.*) The Fund was a purchaser of some of the fraudulent Notes, for which it paid

3

approximately $59,819,316.55 by transferring funds to the 5966 Account. (Motion ¶ 11.) Prior to the petition date, the Fund received transfers from the 5966 Account totaling $24,115,376.51 comprised of principal and interest (the "Transfers"). (*Id.*) The Trustee, in her declaration, attached to the Motion as Exhibit B (the "Trustee Declaration"), asserts that she first demanded the Fund return the Transfers to the Debtor's chapter 11 estate as avoidable transfers under chapter 5 of the Bankruptcy Code. (Trustee Decl. ¶ 3.) After pre-suit resolution negotiations with the Fund failed, the Trustee commenced the Adversary Proceeding on November 22, 2010. (*Id.*) Despite the pendency of the motions to dismiss, the Trustee and Fund continued to meet and discuss the possibility of a negotiated settlement. (*Id.*) Eventually these discussions led to the Settlement Agreement outlined below.

### B.    Xerion's Involvement in the Fraud[2]

The Fund purchased Notes purportedly issued by Solow Realty Development Corp. ("Solow") and the Ontario Teachers' Pension Plan on the secondary market through six total purchases (and one renewal). (Compl. ¶ 16.) The Fund purchased bogus Notes from December 2005 to September 2008. (*Id.*) The Fund made its purchases on the secondary market from entities that they believed were legitimate sellers of the Notes, Archery Capital, LLC ("Archery"), Stafford Towne, Ltd. and Bennington International Holdings Ltd. (*Id.*) These entities were all fictions created by Dreier. (*Id.*) From 2005 to 2008, the Fund received various transfers of principal and interest, but ultimately failed to receive full repayment of its purported investment, making it a "net loser." (Compl. ¶ 40–73.)

The Trustee alleges several facts in the Complaint that, according to the Trustee, put the Fund on "inquiry notice" of Dreier's fraud. As to those facts that are applicable to each of the

---

[2]    The facts recited in this section B are taken from the complaint filed against the Fund on November 22, 2010 (the "Complaint"). (ECF Doc. #1.)

4

defendants that are the subjects of the Trustee's avoidance actions, the Complaint alleges that certain elements of the transactions between the defendants and Dreier should have raised "red flags." The Trustee alleges the following suspicious circumstances: (1) Solow's use of outside litigation counsel, Marc Dreier, to raise capital; (2) Solow's robust financial condition at the time of the investments; (3) the comparatively high interest rates associated with the Solow Notes; (4) the "amateurish" financial statements of Solow provided to the Note investors by Dreier; (5) certain provisions of the "Term Loan Agreements" prohibiting Note investors from contacting Solow; and (6) the use of a Dreier LLP attorney trust account to complete the transaction. (*Id.* ¶ 17–26.)

Specific to the Fund, the Trustee asserts that a "broker's disclosure" requested by the Fund and issued by Dreier put the Fund on "inquiry notice" of the fraud. In the broker's disclosure, Dreier claimed as follows:

- "The Broker [Dreier and Dreier LLP] is independent and did not act as an agent for either [Archery] or [Solow] or any of their affiliates."

- "The Broker is not an employee, officer or director, nor does the Broker have an exclusive contractual relationship or other relationship with either [Archery] or [Solow] or any of their affiliates."

- "The relationship between the Broker and [Archery] or [Solow] is not 'regular' or 'continuous.'"

(*Id.* ¶ 28.) According to the Trustee, the Fund had reason to believe that these statements were false because information provided to the Fund indicated that Dreier had a very close relationship to Solow because he commonly represented to potential investors that he operated the Solow note program with little oversight from anyone at Solow. (*Id.*) Further, the Term Loan Agreements executed between Dreier and Archery listed Drier as the contact person for Solow. (*Id.*)

5

The Trustee also alleges that the Fund was on "inquiry notice" of the fraud as a result of Dreier's imposition of certain confidentiality restrictions. (*Id.* ¶ 33.) The Term Loan Agreements prevented the Fund from sharing information regarding the Notes and Solow's financial condition without Solow's permission. (*Id.*) During the course of the fraud, the Fund requested permission from Dreier to allow the Fund to share information regarding the Notes and Solow with third parties so that the Fund could leverage or sell the Notes, but Dreier repeatedly refused such requests. (*Id.*) On one such occasion in July 2007 the Fund's counsel repeatedly asked Dreier for permission to share information because the Fund needed liquidity. (*Id.* ¶ 34.) According to the Trustee, Dreier refused to permit the Fund to share information, and to avoid further confrontation, Dreier LLP transferred $5 million to the Fund as a purported redemption by Solow of half the first purchased Solow Note. (*Id.*)

The Trustee also asserts that the Fund was on "inquiry notice" of the fraud because Dreier rejected a request made by the Fund to contact Berdon LLP, Solow's auditor, writing "[y]ou should not expect to have direct contact with the auditor for a note of this size." (*Id.* ¶ 35.) Finally, the Trustee contends that the Fund did very little due diligence on Solow or the Ontario Teachers' Pension Plan in connection with its purchase of the Notes. (*Id.* ¶ 36.)

C.    **The Settlement Agreement[3]**

Both the Fund and Trustee have agreed to certain obligations under the Settlement Agreement to effectuate a full and final settlement of the Adversary Proceeding. Additionally, the Settlement Agreement requires that any court order approving the settlement also contain an injunction precluding other creditors from asserting claims against the Fund in connection with their involvement in Dreier's fraudulent scheme.

---

[3]    This section C is intended to be a brief summary of the most salient terms of the Settlement Agreement.

6

1. **Fund's Obligations**

The Settlement Agreement, attached as Exhibit C to the Motion, provides that the Fund shall pay $11,500,000 to the Trustee within 7 days of the entry of an order approving the settlement. (Settlement Agreement ¶ 1.) In addition to this payment, the Fund will provide a release to the Trustee that discharges any claims the Fund has or could have brought against the Debtor and the Trustee. (Settlement Agreement ¶ 3.)

2. **Trustee's Obligations**

Upon receipt of payment, the Settlement Agreement provides that the Trustee will grant a release to the Fund discharging it of "any claims the Trustee has or could have brought against PWP in her capacity as the chapter 11 trustee for DLLP and in her capacity as assignee of the Chapter 7 Trustee's right, title and interest in the Chapter 5 Avoidance Claims." (*Id.*) Furthermore, the Fund shall be granted an allowed general unsecured claim in the plenary chapter 11 case in the amount of $41,453,940.04 as described in the Settlement Agreement:

> (a) The Net Loss Claims shall be allowed in the amount of $35,703,940.04;
>
> (b) The Interest Claims shall be disallowed and expunged in their entirety;
>
> (c) The Fees and Expenses Claims shall be disallowed and expunged in their entirety;
>
> (d) PWP shall be allowed a replacement claim pursuant to 11 U.S.C. § 502(h) in the amount of $5,750,000.00, representing 50% (one-half) of the Settlement Payment;

(Settlement Agreement ¶ 5.) The Settlement Agreement provides that the allowed claim "shall be paid as a general unsecured claim in accordance with [the Debtor's] confirmed chapter 11 plan, or in the event of conversion to chapter 7, by the appointed chapter 7 trustee for DLLP in accordance with the provisions of the Bankruptcy Code." (*Id.*)

7

**D.      The Proposed Injunction**

In addition to the respective obligations of the Trustee and the Fund outlined above, the Settlement Agreement requires that the Fund obtain an order barring claims against it brought by other creditors of the Debtor's estate. (Settlement Agreement ¶ 2.) The Trustee asks the Court to enter an injunction along with its order approving the settlement to ensure that the proposed settlement results in a full and complete resolution of the Fund's potential exposure as a purchaser of, and recipient of payments in respect of, the fraudulent notes distributed by Dreier (the "Injunction").[4] (*Id.*) The proposed Injunction is limited in scope and only applies to "those persons and entities who (1) are creditors or parties in interest in this chapter 11 case, and (2) assert claims or causes of action based on the misconduct of DREIER or [the Debtor], or [the Fund's] receipt of the Transfers." (Motion ¶ 24.) While releases of this type can be problematic, the language of the proposed Injunction is identical to the injunction approved by Judge Bernstein in his order approving the settlement of another adversarial proceeding brought by the

---

[4]     The proposed order, which contains the Injunction, is attached as Exhibit D to the Motion. The requested relief provides as follows:

> ORDERED that any and all creditors and parties in interest in this chapter 11 case (collectively, "Creditor Claimants") shall: (i) he permanently BARRED AND ENJOINED from commencing or continuing any and all past, present or future claims or causes of action, (including any suit, petition, demand, or other claim in law, equity or arbitration) and from asserting any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including claims for attorneys' fees, costs or disbursements), (the "Claims and Causes of Action") against Xerion Partners II Master Fund, Ltd. And Perella Weinberg Partners Xerion Master Fund Ltd. (collectively, the "PWP Releasees") based on the misconduct of MSD or DLLP, or PWP's receipt of the Transfers and releasing and forever discharging all PWP Releasees from any and all Claims and Causes of Action known or unknown, that are, have been, could have been or might in the future be asserted against any of the PWP Releasees based on the misconduct of MSD or DLLP, or PWP's receipt of the Transfers[.]

(Motion Ex. D at 2–3.)

Trustee against GSO Capital Partners LP and its affiliates. *See Order Granting Motion to Approve Trustee's Renewed Motion Pursuant to Section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Agreements*, dated June 8, 2011 (the "GSO Order") (ECF Doc. # 610, No. 08-15051). The Trustee has attached the GSO Order to the Motion as Exhibit A. (*See* Motion Ex. A.) Judge Bernstein initially refused to approve the form of injunction submitted with the GSO settlement, but after the proposed injunction was revised, the injunction was approved.[5]

## II.    DISCUSSION

### A.    Settlement Pursuant to Bankruptcy Rule 9019

Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Under Bankruptcy Rule 9019, the court has the authority to "approve a compromise or settlement." FED. R. BANKR. P. 9019(a). A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before it may approve a settlement. *In re Drexel Burnham, Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest II)*, Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 WL 134893, at *8–9 (D. Conn. Jan. 14, 2011); *Cousins v. Pereira (In re Cousins)*, No. 09 Civ. 1190(RJS), 2010 WL 5298172, at *3 (S.D.N.Y. Dec. 22,

---

[5]    An appeal was taken from the order approving the GSO settlement. Judge Bernstein's decision was affirmed by the district court. *See In re Dreier LLP*, No. 10 Civ. 4758 (DAB), 2010 WL 3835179, at *5 (S.D.N.Y. Sept. 10, 2010). Judge Batts's decision is currently on appeal to the Second Circuit Court of Appeals but the injunction has not been stayed and is currently in effect.

2010); *In re Chemtura Corp.*, 439 B.R. 561, 593–94 (Bankr. S.D.N.Y. 2010); *In re Lehman Bros. Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

A court's responsibility is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re Chemtura*, 439 B.R. at 594 (quoting *In re W.T. Grant, Co.*, 699 F.2d 599, 608 (2d Cir. 1983)) (internal quotation marks omitted). However, the court is not required to go so far as to conduct a trial on the terms to approve a settlement. *Id.* Before making a determination, however, the court must inform itself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) (quoting *TMT Trailer Ferry*, 390 U.S. at 424) (internal quotation marks omitted). While courts have discretion to approve settlements, the business judgment of the debtor in recommending the settlement should be factored into the court's analysis. *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009). "At the same time, a court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement." *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) (citations omitted). In addition, courts may give weight to the opinion of bankruptcy counsel supporting the settlement. *Id.* ("In [approving the settlement agreement], the court is permitted to rely upon 'opinions of the trustee, the parties, and their attorneys.'"). *Chemtura*, 439 B.R. at 594.

To this end, courts have developed standards to evaluate if a settlement is fair and equitable, and, identified factors for approval of settlements based on the original framework announced in *TMT Trailer Ferry, Inc.*, 390 U.S. 414 (1968). The Second Circuit outlined the test for consideration of settlements under the Bankruptcy Rules in *Motorola, Inc. v. Official*

10

*Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). The factors to be considered are interrelated and require the court to evaluate: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining." *Id.* The burden is on the settlement proponent to persuade the court that the settlement is in the best interests of the estate. *See* 8 NORTON BANKRUPTCY LAW AND PRACTICE 3D §167:2 (3d ed. 2011).

  **B.**  **The Settlement Agreement Satisfies the Standards for Approval**

  Because no objection to the Motion has been filed, the Court will truncate the analysis required for approval of a settlement under Bankruptcy Rule 9019. The *Patriot Group* Opinion, also issued today, includes a lengthy analysis of the elements of the claims and likely defenses asserted in this and similar adversary proceedings filed by the Trustee. Therefore, it is unnecessary to review the applicable legal principles underlying the claims. The majority of the claims asserted by the Trustee have survived the defendants' motions to dismiss. Absent settlements, the parties are facing long and contentious litigation with substantial risks and uncertain outcomes. A brief discussion of some of the settlement factors follows.

11

### 1. Likelihood of Success in Litigation Balanced Against the Benefits of the Settlement

A critical factor to be considered in assessing a proposed settlement is the balance between the benefits of a successful outcome in the litigation discounted to reflect the likelihood of that outcome, and the benefits of the proposed settlement. *See Iridium*, 478 F.3d at 462. More often than not, this balance will tip in favor of the settlement. *Hilsen*, 404 B.R. at 71 ("It is fair to say that this balance often tips in favor of settlement. The outcome of litigation is nearly always uncertain and may be distant. It is also costly. And the enforcement of any resulting judgment may be far from sure. A settlement, by contrast, eliminates uncertainty and delay, reduces costs, and brings finality to the parties' dispute.").

Applying the facts as outlined in the Motion, this factor tips strongly in favor of approval of the proposed settlement. If the Trustee had fully pursued the avoidance actions against the Fund and was successful, the Debtor's estate would have received a maximum of $24,115,376.51. A review of the *Patriot Group* Opinion demonstrates that this case involves numerous disputed issues of fact and law. While the Trustee has asserted strong claims that have largely survived the motions to dismiss, the ultimate outcome cannot be predicted. In such circumstances, settlement makes sense from the standpoint of all parties.

The Court determined in the *Patriot Group* Opinion that, in the case of a "net loser" such as the Fund, the Trustee is limited to recovery of amounts repaid in excess of principal *on the constructive fraudulent conveyance claims*. Nevertheless, the defendants in the Trustee's avoidance actions are subject to a judgment for avoidance of all principal and amounts in excess of principal on the actual fraudulent conveyance claims under the Bankruptcy Code and NYDCL. Because of the so-called Ponzi scheme presumption, the actual fraudulent intent of the transferor is presumed. The Fund's defense will in large measure depend upon its success in

12

establishing a good faith defense under § 548(c) of the Bankruptcy Code and § 278 of the NYDCL. As discussed in the *Patriot Group* Opinion, while the legal standard for determining good faith is far from clear, the Trustee has alleged facts from which a trier of fact could well conclude that the Fund would not prevail on a good faith defense. This is, of course, only one of many factual and legal issues on which the outcome of a fully litigated case will depend.

Counsel for the Fund also asserted that the funds it deposited in the 5966 Account were held by Dreier LLP in an express trust. In the *Patriot Group* Opinion, the Court denied the motions to dismiss asserted on this trust fund theory, but the Court recognized that the outcome of this issue rested on disputed issues of fact and law.[6] The uncertainty of outcome on this important issue favors resolution by settlement as well.

This case is at an early stage of the proceedings. While "formal" discovery has not taken place in the Adversary Proceeding, the Trustee had the benefit of substantial Rule 2004 discovery before the Adversary Proceeding was filed. Because the Dreier LLP bankruptcy came on the heels of Marc Dreier's criminal conviction, all parties have gained substantial knowledge of facts surrounding Dreier's Ponzi scheme and fraud. The Court concludes, therefore, that the sophisticated counsel representing the parties to this action who negotiated this settlement has a sufficient factual and legal basis to assess the risks and reach a well-reasoned settlement.

The Settlement Agreement guarantees a recovery of $11.5 million for the benefit of creditors, which totals 48% of the Transfers received by the Fund. This substantial recovery will provide very tangible benefits to all creditors of Dreier LLP, while avoiding the risk of an adverse outcome. The Fund also achieves a substantial benefit by substantially reducing its exposure to future liability.

---

[6] The Trustee may only seek avoidance of transfers of "an interest of the debtor in property," so this is a potentially case-dispositive issue. *See, e.g.*, 11 U.S.C. § 548(a)(1).

### 2.     Likelihood of Complex and Protracted Litigation

Another important factor in assessing a proposed settlement is the expense, burden, and delay of complex and protracted litigation. *See Iridium*, 478 F.3d at 462. Here, the record reflects that the preparation for trial and the trial of the matter would be time-consuming and complex for both the Trustee and the Fund. As described above, the Trustee faces challenging factual issues with respect to the defenses raised by the Fund. These challenges make complex and protracted litigation between the Trustee and Fund likely, which would result in considerable cost to the estate and delay in the administration of the case. Therefore, this factor also weighs in favor of approval of the Settlement Agreement.

### 3.     The Paramount Interests of the Creditors

Another factor to be considered is the "paramount interests of the creditors," including both the benefits to be received by the creditors and the creditors' position with respect to the proposed settlement. *See Iridium*, 478 F.3d at 462. "The first of these calls for the Court to assess the objective benefits that the creditors may receive, while the second directs the Court to consider the views expressed by the creditors with respect to settlement." *Hilsen*, 404 B.R. at 75. There are two key benefits creditors receive under the Settlement Agreement. First, there may be a greater payout to general unsecured creditors because of the $11.5 million coming into the estate to be distributed to the Debtor's creditors. As noted, this amount is about half the sum that would be recovered if the Trustee successfully litigated the Adversary Proceeding to its completion; however, the Trustee faces numerous litigation risks based on the multiple disputed issues of fact and law. In addition to increasing the amount of funds available for distribution to creditors, the Settlement Agreement also increases each creditor's potential pro rata share of the distribution through reduction of the Fund's net loss claim. Initially, the Fund filed a proof of

claim in the amount of $46,027,639 (exclusive of attorney fees and costs). Under the Settlement Agreement, the Fund has agreed to reduce its claim to $41,453,940.04 by eliminating its claims for interests, fees and costs, and reducing its claim for lost principal. Furthermore, the Fund has agreed to take only 50% of the replacement claim it would be entitled to under § 502(h). *See* 11 U.S.C. § 502(h) ("A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."). Since the Fund holds a general unsecured claim, reducing the Fund's claim from around $46 million to under $42 million results in an increase of the pro rata share of the distribution for each of the other general unsecured creditors.

The second part of the paramount interests of creditors factor asks the court to consider the views expressed by creditors with respect to the settlement. *Hilsen*, 404 B.R. at 75. This is a relatively straightforward inquiry in this case as no party has objected to the Settlement Agreement. While the absence of objections does not equal affirmative support from creditors, it certainly indicates an absence of opposition.

Based on the record, the paramount interests of creditors, including benefits to be received by creditors and the creditors' position with respect to the proposed settlement, weigh in favor of approval of the settlement as creditors are receiving substantial benefits under the Settlement Agreement and there have been no objections filed to its approval.

### E. The Requested Injunction

The Motion also asks the Court to grant an injunction barring claims against the Fund brought by other creditors of the Dreier estate "to ensure that the proposed settlement results in a full and complete resolution of [the Fund's] potential exposure as purchaser of, and recipient of

15

payments in respect of, the [the fraudulent notes]." (Motion ¶ 13.d.) The Injunction is substantively identical to the one granted by Judge Bernstein in his order approving the settlement of the GSO matter. (GSO Order at 2–3.) Judge Bernstein believed an injunction was necessary in order to facilitate a successful settlement of the GSO matter *In re Dreier LLP*, 429 B.R. 112, 133 (S.D.N.Y. 2010) (stating that if the injunction is not granted "[t]rustees will be hampered in their ability to pursue and ultimately settle fraudulent transfer claims from a transferee fearful of paying twice for the same transfer—once on the Trustees' claim and a second time on the derivative claim."). Judge Bernstein did not initially approve the settlement, ruling that the scope of the requested release and injunction exceeded the Court's jurisdiction. *Id.* After the Trustee revised the injunction to the form also requested by the Trustee in this case, Judge Bernstein approved the settlement and entered the injunction. While third-party releases and injunctions can raise difficult issues for bankruptcy courts, the Court agrees with Judge Bernstein's conclusions that the Court has subject matter jurisdiction to enter the requested relief and enforcing the injunction is necessary for a full and final settlement of the Adversary Proceeding.

    The Injunction is necessary to facilitate a successful settlement of the Adversary Proceeding because, without it, the Fund could potentially be subjected to avoidance actions brought by third parties, which would effectively render settling with the Trustee meaningless.

### III. CONCLUSION

For the foregoing reasons, the Court approves the Settlement Agreement as fair, equitable and in the best interests of the estate. A separate order will be entered approving the settlement and entering the Injunction.

DATED:   June 16, 2011
         New York, New York

                                   ____/s/Martin Glenn_____
                                         MARTIN GLENN
                                   United States Bankruptcy Judge